MICHAEL I. INZELBUCH, ESQUIRE
Sovereign Bank Building
555 Madison Avenue
Lakewood, New Jersey 08701
Phone: 732-905-0325
Fax: 732-886-0806
E-Mail: michaelinz@aol.com & lakewoodlaw555@aol.com
I.D. No.: 5635
Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

C.U. a Minor Child, by her parents and
Guardians Ad Litem, G.U. & J.U.

No._____

Plaintiffs,

Judge _____

v.

**VERIFIED COMPLAINT**

**PURSUANT TO**

**20 U.S.C. § 1415(i)(2)**

SHREWSBURY BOROUGH
BOARD OF EDUCATION

Defendants.

Plaintiff, C.U., a minor child, by and through her parents and Guardians Ad Litem, G.U. & J.U. (the "Parents"), residing at 82 Beechwood Drive, Shrewsbury, New Jersey 07702, by way of a Complaint against Defendant Shrewsbury Borough Board of Education (the "Defendants"), with business offices at 20 Obre Place, Shrewsbury, New Jersey 07702.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the Constitution and laws

1

of the United States, in particular, the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 <u>U.S.C.</u> § 1400 et. seq.; 20 <u>U.S.C.</u> § 1415(i)(3), which provides jurisdiction over claims for attorneys' fees and costs in matters arising under the IDEA; 42 <u>U.S.C.</u> § 1983, and 28 <u>U.S.C.</u> §§ 2201 and 2202, which authorize this Court to grant declaratory and injunctive relief.

2.    Venue in this district is appropriate under 28 <u>U.S.C.</u> § 1391(b) because all of the Defendants conduct business within Shrewsbury, Monmouth County, New Jersey, and all the events or omissions giving rise to Plaintiff's claims occurred within Shrewsbury, Monmouth County, New Jersey.

## PARTIES

3.    Plaintiff, C.U., is a 6 year-old (date of birth: January 29, 2004) student who at all times relevant was a resident of and domiciled within the geographical area served by the Defendant.   C.U. has been determined by the Defendant to be Eligible for Special Education and Related Services pursuant to the IDEIA.

4.    G.U. & J.U. are the parents and Guardians Ad Litem of Plaintiff, C.U.

5.    The Defendant is the legally constituted body responsible for the conduct and supervision of schools in the Shrewsbury Borough School District (the "District") pursuant to the <u>N.J.S.A.</u> 18A:10-1 <u>et. seq.</u>, and is a local education agency obligated to observe the requirement of the IDEIA pursuant to 20 <u>U.S.C.</u> § 1401(15).

2

6. C.U. has disabilities which significantly interfere with learning. Specifically, C.U. has significant and chronic medical issues. C.U. experienced difficulty stooling and poor eating since birth. C.U.'s eating difficulties became particularly acute at nine months old and resulted in a naso-gastic feeding tube being placed at 12 months of age due to failure to thrive. In April 2005, a percutaneous gastrostomy was placed in C.U.'s abdomen and remained in place at all relevant times because her issues with eating and weight gain remained a substantial concern.[1]

7. Since April 2005, the Parents have sought to determine the underlying cause for C.U.'s chronic problems stooling, including explosive diarrhea, and related eating difficulties. During this time, C.U. was fed exclusively through the feeding tube and had inconsequential oral food intake. C.U. underwent extensive and invasive medical testing and hospitalizations at the Children's Hospital of Philadelphia, Mommouth Medical Center, Columbus Children's Hospital and Johns Hopkins' University Medical Center. It was determined by C.U.'s treating gastroenterologist in Columbus, Ohio that C.U. had patches of inflammation in both her small and large intestines. While an exact diagnosis has yet to be determined, C.U.'s chronic medical condition most similarly resembles inflammatory bowel diseases such as Crohn's Disease and is auto immune based. In addition to her chronic

---

[1] Although C.U.'s issues with eating and weight gain continue, the gastrostomy tube was recently removed in August of 2010.

3

problems with eating and stooling, C.U. has experienced significant pain in her colon, serious MRSA skin infections, various forms of strep infections, Lyme's disease, several hospitalizations due to dehydration and an increased susceptibility to common childhood illness.

8.    Commencing in the spring 2005, C.U. received speech and occupational therapy through the Early Intervention System due to developmental delay. C.U. received intensive feeding and speech therapies at Children's Specialized Hospital in Toms River, NJ, as well as private speech therapy at the West Long Branch Speech and Hearing Center, until she turned 3 years of age and was referred for further services through the District. In September 2007, C.U. began attending regular weekly psychotherapy sessions with her treating therapist Gretchen Morgan for what has been characterized as post-traumatic stress disorder due to medical trauma.

9.    Due to her medical history, C.U. also has significant anxiety, behavioral and emotional issues which interfered with her ability to learn and attend school. At all relevant times, C.U. was not completely toilet trained, having regular stooling and urine accidents. C.U.'s years of chronic and painful bowel problems resulted in C.U. not learning to properly control her bowels and bladder. C.U.'s anxiety is not only caused by her toileting issues but also likely significantly exacerbates her toileting issues. As noted by C.U.'s treating pediatrician, "as [C.U.] needs to use the bathroom, she becomes more anxious, which makes

4

it more difficult for her to toilet, which then further increases her anxiety and so on." See **EXHIBIT "A"**

10. In 2007, C.U. was evaluated by the District's Child Study Team which included, among other things, a thorough social and medical history by the District's social worker, Nancy Baker, as well as a complete medical history by the District's school nurse, Eileen Brand. It was determined that C.U. was eligible to attend the Preschool Disabled Program and to receive one session of speech/language services per week in a small group. See C.U.'s IEP for the 2007-2008 school year attended hereto as **EXHIBIT "B"**. The District's Preschool Disabled Program consisted of two hours of class time with the limited enrollment of only five other students who were, upon information and belief, also classified under IDEIA. At that time, no provisions were made to place C.U. in a program with typically developing peers. Furthermore, no provisions were made to address C.U.'s anxiety and emotional issues, toileting issues or high rate of absenteeism.

11. For the 2008-2009 school year, C.U. was again determined to be eligible for the Preschool Disabled Program and to receive two sessions of speech/language services per week in a small group. See C.U.'s 2008-2009 IEP attached hereto as **EXHIBIT "C"**. Again, the District's Preschool Disabled Program consisted of two hours of class time with the limited enrollment of only two other students who were, upon information and belief, also classified under IDEA. At that time,

arrangements were made for C.U. to attend a fully integrated Preschool Disabled Program in a neighboring school district for an additional two hours in the afternoon. After several weeks, however, the District sought to withdraw C.U. from this program due to her excessive absences and instead placed C.U. in the District for an additional hour in a kindergarten classroom.

12. After the commencement of the Due Process Petitions, the Parents attended a mediation in June 2009 with the District at which time the Parents were informed for the first time that the District had a behavioral therapist on staff who could work with C.U. to address her toileting difficulties. The District's kindergarten program is a full-day program and C.U.'s inability to be completely toilet trained remained a substantial concern and source of anxiety for C.U. The Parents attempts to schedule meetings with the District's behaviorist during the Summer 2009 were to no avail as they were informed in August of 2009 that the District's behaviorist did not have time to work with C.U. The District finally hired Sandra Bendokas in September 2009 to evaluate C.U. and develop a behavioral plan. The Parents began to implement the behavioral plan in March 2010 at their own expense.

13. Following the mediation, the Parents attended an IEP meeting in the last few days of the school year where they requested C.U. be provided, among other things, an aide, particularly for lunch, recess and gym, speech therapy, behavioral therapy, counseling services and

6

home instruction in the case of extended absences. During the June 2009 IEP meeting the District's Child Study Team provided a draft IEP to the Parents which provided for a general classroom aide, speech therapy and home instruction. See District's proposed IEP for 2009-2010 school year attached hereto as **EXHIBIT "D"**.

14. In addition, during this June 2009 IEP meeting, the District informed the Parents for the first time that the Preschool Disabled classroom teacher had been placing C.U. in the bathroom every 15 minutes without their knowledge. Concurrently with such placement, C.U. had begun having tantrums in the morning and had been refusing to go to school. Repeatedly the Parents requested that a toileting plan be developed by professionals who had some experience in behavioral and/or toileting issues which would be coordinated with both the Parents and C.U.'s outside private therapist to avoid additional trauma to C.U. and to address her school avoidance issues. The plan implemented by the classroom teacher caused C.U.'s school avoidance and further exacerbated C.U.'s toileting issues.

15. In the spring of 2009, C.U. began to increase her oral food intake which reduced her reliance on the feeding tube for nourishment. As of September 2009, C.U. was supporting herself nutritionally completely by mouth, representing a substantial accomplishment for C.U. Notwithstanding such accomplishment, the Parents had been advised that to remove the feeding tube, C.U. needed to experience a period of

7

stable weight gain as well as demonstrate success in full-day kindergarten.

16. C.U. began full day kindergarten in September 2009 without an IEP. The Parents repeatedly requested that C.U. be provided with behavioral and counseling support services while in school to address C.U.'s anxiety and toileting issues, but the District refused.

17. During the months of September and October 2009, the District maintained a record of C.U.'s eating and drinking that demonstrates that C.U. was eating and drinking minimally during the school day. The District also maintained a record that demonstrates that C.U.'s rate of use of the toilet decreased over the same time period.

18. On October 29, 2009, J.U. delivered to Ms. Eileen Brand, the District's School Nurse, growth charts from a then recent visit by C.U. to her pediatrician. By letter provided to the District, dated October 30, 2009, Dr. Maria Micale, C.U.'s treating pediatrician, indicated that C.U.'s rate of growth and weight gain had declined substantially over the previous several months and that such decline was cause for serious concern given C.U.'s prior failure to thrive. (See **EXHIBIT "E"** annexed hereto). Dr. Micale further indicated that it was her opinion that C.U. was likely managing her food and water intake while in school to minimize her need to use the toilet. (*Id.*) Dr. Micale stated that the decline in the rate of growth and weight gain suggested that "[C.U.'s] reduction in food

8

intake [was] severe and represent[ed] a substantial set back in [C. U.'s] efforts to thrive independent of her feeding tube." (*Id.*)

19. On October 29, 2009, the Parents met with certain of the District's representatives, including Nancy Baker, the District's social worker and C.U.'s case manager. At such meeting, the Parents requested that the District provide immediately necessary counseling services for C.U. to address her anxiety issues. The District denied this request on the grounds that such services would only be provided as part of a resolution of the Due Process Petitions. When the Parents offered to resolve the Due Process Petitions, the District refused. G.U. memorialized the request for counseling services in a letter to Ms. Baker, dated and delivered on October 29, 2009. (See **EXHIBIT "F"** attached hereto).

20. On November 2, 2009, the Parents stopped sending C.U. to Shrewsbury Borough School as a consequence of the District's continued refusal to provide necessary support services.

21. The Parents consistently requested that the District provide C.U. with a free and appropriate public education ("FAPE") including an appropriate IEP and the appropriate supports and modifications C.U. was in need of, to no avail.

22. The Parents consistently requested that the District provide C.U. with a truly *individualized* program with appropriate supports and modifications.

9

## FIRST DUE PROCESS PETITION

23. The Parents initially filed for Due Process on or about May 8, 2009, seeking, in part, the following:

    A. Independent Evaluations in the following domains:

        a. Learning/Educational Evaluation
        b. Speech/Social Skills/Pragmatic
        c. Psychological;

    B. An I.E.P. providing appropriate goals and objectives for C.U. and based on objective criteria and arrived at by thorough and objective evaluations with meaningful parental input and particularly suited to C.U.'s unique needs with same allowing her to make meaningful progress;

    C. An appropriate full-day program based on C.U.'s unique and *individualized* needs, including, but not limited to, a truly *individualized* IEP, with related services, parent training and behavioral supports;

    D. An appropriate and truly *individualized* full-day placement for C.U. based on her unique and *individualized* needs;

    E. Reimbursement of any and all out-of-pocket expenses expended by the parents of C.U. including, but not limited to, attorney fees;

10

   F. Reimbursement for any and all costs due to the District's *failure* to provide a free and appropriate public education to C.U., including, but not limited to, evaluations and on-going therapies;

   G. Compensatory Education for the time period that the District knew, or should have known, that C.U. was not provided with *individualized* special education instruction, thus, preventing C.U. from receiving a free and appropriate public education; and

   H. Any and all other relief the Court may deem appropriate.

          (See **EXHIBIT "G"** attached hereto)

24. Plaintiffs' petition was transmitted to the Office of Administrative Law (OAL) where it was assigned the OAL Docket Number, EDS 8142-09, and a hearing was scheduled on or about July 13, 2009, before Administrative Law Judge Ana C. Viscomi.

25. The District filed an ANSWER to the aforementioned Due Process Petition on or about May 20, 2009. (See **EXHIBIT "H"** attached hereto)

## SECOND DUE PROCESS PETITION

26. The Parents were forced to file again for Due Process on or about June 30, 2009, due to C.U. continuing to be denied a free appropriate public education, including, but not limited to, being denied the opportunity to fully participate in the (limited) general education portion

11

of her day, being denied the services of an appropriate behaviorist to analyze her behaviors and toileting issues at school (and home) and being denied an opportunity to receive home instruction when she is ill due to her fragile medication condition, notwithstanding the District acknowledging that C.U.'s high rate of absenteeism caused further regression to C.U. who experienced difficulties in reading (unbeknownst to the parents until announced by the District's Special Education Director (Pearl Charatz) at a mediation which was held on or about June 16, 2009).

27. The Second Due Process Petition sought, in part, the following:

    A. Independent Evaluations in the following domains:

        a. Learning/Educational Evaluation
        b. Speech/Social Skills/Pragmatic
        c. Psychological;

    B. An IEP providing appropriate goals and objectives for C.U. based on objective criteria and arrived at by thorough and objective evaluations with meaningful parental input and particularly suited to C.U.'s unique needs with same allowing her to make meaningful progress;

    C. An appropriate full-day program for C.U. based on her unique and *individualized* needs, including, but not limited to, a truly *individualized* IEP, with related services, parent training and behavioral supports;

12

D. An appropriate and truly *individualized* full-day placement for C.U. based on her unique and *individualized* needs as described above;

E. Reimbursement of any and all out-of-pocket expenses expended by the parents of C.U. including, but not limited to attorney fees;

F. Reimbursement for any and all costs due to the districts **failure** to provide a free and appropriate public education to C.U., including, but not limited to, evaluations and on-going therapies;

G. Compensatory Education for the time period that the school district knew, or should have known, that C.U. was not provided with *individualized* special education instruction, thus, preventing C.U. from receiving a free and appropriate public education; and

H. Any and all other relief the Court may deem appropriate.

(See **EXHIBIT "I"** attached hereto)

28. Plaintiffs' second due process petition was transmitted to the Office of Administrative Law (OAL), where it was assigned the OAL Docket Number, EDS 8376-09.

29. On or about July 23, 2010 The Honorable Ana C. Viscomi, ALJ, entered an ORDER OF CONSOLIDATION for both of the

13

aforementioned Due Process filings. (See **EXHIBIT "J"** attached hereto).

30. The District did not timely file an answer to the Second Due Process Petition.

## DEFENDANT'S ADMISSIONS

31. The District knew, or should have known, that C.U. was in need of, including, but not limited to, a truly *individualized* program; however, the District failed to provide C.U. with same, denying C.U. a free and appropriate public education as required by law.

32. Between June 3 and June 30, 2009, the Parents provided independent evaluations (the "Independent Evaluations") to Defendant in support of the claims asserted in the Due Process Petitions.

33. Defendant failed to timely respond to the Independent Evaluations. Indeed, Defendant did not respond until September 11, 2009, and then only after ALJ Viscomi ordered, on September 4, 2009, the District to respond by September 11, 2009.

34. On September 11, 2009, Defendant sent Plaintiff a letter (the "September 11 Letter"), in which Defendant admitted most of the allegations in the Due Process Petitions. (See **EXHIBIT "K"** attached hereto). In particular, Defendant admitted, among other things, that: C.U. "exhibits *anxiety* and somatization" (*Id.* at Page 2 (emphasis in original)); "Toileting plan: we have agreed this be developed . . . [by] Sandra Bendokas" (*Id.*); "Counseling as a related service: agreed . . . ."

14

(*Id.*); "Collaboration on a course of action regarding behavioral issues: agreed . . . ." (*Id.*); "There is no dispute that C.U. is classifiable as Other Health Impaired." (*Id.* at page 5)

35. Notwithstanding Defendant's admissions contained in the September 11 Letter, Defendant refused to provide C.U. with a free and appropriate education, forcing the Parents to continue to prosecute the Due Process Petitions. As a consequence, the Parents engaged White & Case LLP ("White & Case")[2] as additional counsel to assist with this litigation. C.U. is a pro bono client of White & Case.

36. The hiring of additional counsel was made necessary by Defendant's dilatory and bad faith conduct (as more fully set forth below), especially its failure to immediately address the deficiencies in C.U.'s program and related services despite Defendant's express admissions in the September 11 Letter.

37. The parties met on November 12, 2009 before ALJ Viscomi, during which time the parties worked to agree on an appropriate program and related services for C.U. On November 13, 2009, the terms of a proposed settlement were read into the record during a hearing before ALJ Viscomi (the "First Settlement Agreement"). Among other things, the District agreed, that (a) the recommendations of Sandra Bendokas, the District's behaviorist, contained in her November 4, 2009 report would be accepted with limited exception, (b) the District's psychologist, Sandra Bendokas and C.U.'s private therapist (at the

---

[2] G.U. is an equity partner of White & Case.

Parents' expense) would meet regularly to discuss C.U.'s progress and needs and develop a program for C.U., (c) counseling by the District's psychologist would be provided as a related service, (d) parent and home services of 20 hours per month would be provided by the District's behaviorist, (e) occupational therapy and speech therapy would be provided as recommended by the Independent Evaluations, and (f) specialized training of aides for C.U. would be provided by Sandra Bendokas. (See **EXHIBIT "L"** attached hereto, the "November 13 Transcript").

38. The First Settlement Agreement was the product of two days of hearings and chambers' conferences held before and by ALJ Viscomi on November 12 and 13, 2009 and attended by G.U., J.U. and the District's Director of Special Services/Assistant Superintendent.

39. The District's attorneys recommended that the District enter into the First Settlement Agreement and sought to have the District's Superintendant, who at all times relevant was not a member of C.U.'s child study team or IEP team, obtain approval from the Defendants.

40. Shortly thereafter, Plaintiff was informed that the District's Superintendant refused to approve the First Settlement Agreement and as a consequence the Defendant would not perform under the First Settlement Agreement.

16

41. On November 19, 2009, the Parents enrolled C.U. in a part-time private kindergarten program administered by Leapfrog Learning Center pending resolution of the Due Process Petitions.

42. In December 2009, Defendant informed Plaintiff that it was replacing its counsel of record causing further delay and cost to the Parents.

43. In December 2009 and January and February of 2010, Plaintiff was required to seek numerous orders of ALJ Viscomi compelling Defendant to comply with discovery requests and prior orders of the Court.

44. On or about March 7, 2010, one year following the filing of the First Due Process Petition and six months following the District's delivery of the September 11 Letter, the parties herein entered into a "SETTLEMENT AGREEMENT" (**EXHIBIT "M"**). Specifically, the following, in part, was agreed upon (partial listing):

> A. The District agreed to conduct an IEP meeting wherein an *individualized* IEP would be discussed and agreed upon;

> B. The District accepted the Evaluation Reports of Sandra Bendokas of New Jersey Care; Lynn Chodos of Children's Center Program, LLC; and Susan Smith-Foley of Avon Occupational Therapy, Inc. The District accepted in part the Evaluation Reports of Noelle Cauda-Laufer and Michelle Stern;

C. The District agreed to include in the IEP an individualized behavioral plan, including in-school behavioral consultation, home consultation, training, supplemental services and collaborative team meetings, each to be determined at the discretion of Sandra Bendokas;

D. The District agreed to provide speech therapy and occupational therapy as recommended by the Independent Evaluations;

E. The District agreed to provide C.U. with counseling as a related service to address anxiety and related issues with frequency, duration and goals to be determined collaboratively by Dr. Ann Mancuso (the District's psychologists), Gretchen Morgan (C.U.'s private therapist) and Sandra Bendokas;

F. The Present Level of Educational Performance section of C.U.'s IEP would include numerous treating doctor reports, notes and recommendations;

G. C.U. would be provided the services of an aide throughout the school day with an individual one-to-one aide being provided for lunch, recess and gym, and with training to be provided by New Jersey CARE LLC per the reports of Sandra Bendokas;

18

H.   Home instruction would be provided to C.U. following three absences from school with a medical note.

45.   With regard to the aforementioned "SETTLEMENT AGREEMENT" the parties herein agreed upon an IEP on or about March 11, 2010 and is attached hereto as **EXHIBIT "N"**.

46.   On or about March 12, 2010 The Honorable Ana C. Viscomi, ALJ entered into a "DECISION APPROVING SETTLEMENT" (**EXHIBIT "O"**).

47.   On March 23, 2010 (**EXHIBIT "P"**), Plaintiffs' attorney forwarded an itemized billing statement to Defendants attorney covering the period up to March 23, 2010 at 12:45 pm.

48.   On April 13, 2010 (**EXHIBIT "Q"**) Plaintiffs' attorney again forwarded an itemized billing statement to Defendants attorney covering the period up to March 23, 2010 at 12:45 (2nd request).

49.   Since the last billing submission (the last date reflected on my billing statement) and as of today's date, Plaintiffs' counsel has expended an additional time on this matter. Specifically, Plaintiffs' counsel has conversed with parties, reviewed the file herein, communicated with Defendants attorney, reviewed and forwarded e-mails from the Parents, researched, prepared and filed this Complaint, as well as incurred additional expenses such as postage, photocopies, certified mailings, overnight mailings, filing fees herein, etc.

19

50. As of this date, Plaintiffs have not received any payment from the Defendant or their insurance carrier.

## COUNT ONE

51. Under the IDEIA and New Jersey law, C.U. is a "disabled" child.

52. As a "disabled" child, C.U. is entitled to the protections of the IDEIA and New Jersey law, including 20 U.S.C. § 1412, 34 C.F.R. § 104.37, 34 C.F.R. § 104.34(b), 34 C.F.R. § 104.61, 28 C.F.R. part 35, and N.J. Stat. Ann. 18A:46-23 (West 1999).

53. Under the IDEIA and New Jersey law, the District maintains a duty to implement an IEP to provide C.U. with a free and appropriate public education. C.U.'s rights were violated when she was denied appropriate supports, modifications, and programs prior to the Parents retaining an attorney.

54. Defendant violated the express terms of the IDEIA and New Jersey law by failing to develop and implement a truly *individualized* IEP prior to the Parents retaining an attorney.

55. The actions of the Defendant has caused the Parents to incur unnecessary expenses and costs in retaining the services of attorneys, obtaining evaluation, more importantly, denied C.U. the educational supports and modifications she required.[3]

---

[3] The pro bono basis of White & Case's representation does not preclude an award of attorneys' fees related to its representation under the IDEA. *Blanchard v. Bergeron*, 489 U.S. 87 (1989), (holding that fee-shifting statutes require payment of "reasonable" attorneys' fees, regardless of any fee arrangement that calls for a lesser amount). Neither White & Case as a law firm, nor G.U. as a partner in that law firm, will retain any portion of any fees awarded based on this Complaint. White & Case intends to donate any fee award to charity. The pro bono basis of White & Case's representation was intended to confer a benefit upon C.U., not the District. Had White & Case been unwilling to represent C.U. as a pro bono client, Parents would

56.     Plaintiff is the prevailing party within the meaning of 20 <u>U.S.C.</u> §
        1415(i)(3)(B) and is entitled to reimbursement of their attorneys' fees
        and costs of litigation expended in this mater.

57.     Plaintiff seeks reimbursement in the aggregate amounts as follows:
        $<u>55,345.04</u> in fees incurred by Michael I. Inzelbuch, Esq. (as of the last
        statement of services dated March 23, 2010); Fees and Costs
        associated with this suit incurred by Michael I. Inzelbuch, Esq.;
        $<u>70,529.00</u> (**EXHIBIT "R"**) in fees incurred by White & Case, as well
        as fees related to evaluations provided by Dr. Gallina, fees related to
        evaluations provided by Vivian Attanasio, tuition costs for Leap Frog
        Learning Center for the period of November 19, 2009 through March
        12, 2010 (the date the Settlement Agreement was approved by ALJ
        Viscomi) and fees related to behavioral services provided by Sandra
        Bendokas.

WHEREFORE, Plaintiffs' demand judgment form the Defendant for the
reimbursement of their attorney's fees, costs pursuant to 20 <u>U.S.C.</u> § 1415(i)(3),
and such other relief as this Court determines necessary and proper.

DATED: **October 4, 2010**

                                        **MICHAEL I. INZELBUCH, ESQ.**
                                        **Attorney for Plaintiffs**
                                        **I.D. No.: 5635**

---

have been compelled to expend additional funds out of pocket on legal fees. Relieving the District of the
responsibility of paying such costs solely because of the pro bono nature of such representation would
confer an inappropriate benefit to the District, particularly in light of District's dilatory tactics.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues.

## CERTIFICATION

Pursuant to L.C.R. 11.2, I hereby certify that this matter is not the subject

of any other action pending in any Court or the subject of a pending arbitration or

administrative proceeding.

DATED: **October 4, 2010**

**MICHAEL I. INZELBUCH, ESQ.**
**Attorney for Plaintiffs**
**I.D. No.: 5635**

22